IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| United States of America, ) | Case No.: 4:11-cr-00538-RBH |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **ORDER** |
| ) | |
| Dexter Antonia Drake, ) | |
| ) | |
| Defendant. ) | |
| _____) | |

Pending before the Court is the Defendant Dexter Antonia Drake's ("Defendant's") Motion to Suppress [Docket #41] the firearm found in his residence and the alleged two statements he gave to two different police officers on or about October 17, 2009. For the following reasons, the Defendant's motion is granted in part, denied in part.

## **Procedural History and Factual Background**

On April 26, 2011, a federal grand jury returned an indictment against the Defendant. Count One charged the Defendant with knowingly possessing a firearm, subsequent to having been convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2) & (e). A warrant was issued for the Defendant's arrest. On May 10, 2011, the Defendant entered a plea of not guilty at his Arraignment. On August 10, 2011, the Defendant filed the instant Motion to Suppress. The Government filed a response in opposition on September 7, 2011. The Court held a hearing on the motion on September 12, 2011.

The events that resulted in the seizure of the firearm and the Defendant's subsequent statements occurred on the evening of October 16, 2009, and the morning of October 17, 2009, between the hours of 1:00 a.m. and 4:30 a.m. It is undisputed that the Defendant and his girlfriend at the time, Adrienne Oliver, got into a verbal argument and a physical altercation ensued at their home on the evening of

October 16, 2009.  The Defendant hit, kicked, and stomped Ms. Oliver.  Eventually, Ms. Oliver was able to escape the home and run to her uncle's house nearby.  While she was attempting to get inside her uncle's house, she heard several gunshots.  Someone called 911, and law enforcement officers responded.  At the motion hearing, Deputy Robert White of the Chesterfield County Sheriff's Office testified that he received a call from dispatch around 1:00 a.m. on October 17, 2009, concerning a domestic dispute at 509 Campbell Road, where the Defendant lived with Ms. Oliver.  Immediately upon arriving, Deputy White noticed a GMC Yukon with broken windows and dents in the body of the vehicle.  The front door of the residence was open, and the police entered the house.  They saw torn clothing and clumps of hair on the floor.  The house was "cleared" for people; no one was inside.  Deputy White then encountered Ms. Oliver's uncle, Mr. Harris, who said that he heard shots and that Ms. Oliver was at his house.  According to Deputy White, he then spoke to Ms. Oliver at her uncle's house and obtained consent from Ms. Oliver to search the house at 509 Campbell Road for a 380 pistol prior to his re-entering the house and seizing the firearm from under a couch.  Ms. Oliver, on the other hand, testified at the motion hearing that she did not give Deputy White consent to go into the house.

Meanwhile, the Defendant left the house after the altercation and went to his mother's house.  The Defendant spoke with Deputy White via phone and told him where he was located.  Deputy White stated that he was on his way.  When Deputy White arrived at the Defendant's mother's house, it is disputed as to whether the Defendant admitted to Deputy White that he had discharged the firearm into the ground to scare Ms. Oliver as she was fleeing.  According to the Defendant, the only words exchanged between the two <u>before</u> he was placed in handcuffs and arrested was Deputy White's stating that he had found a gun and some scales inside the house.  However, Deputy White testified that the Defendant was placed under arrest and read his Miranda rights only after the Defendant voluntarily

2

admitted to discharging the firearm to scare Ms. Oliver, and the government elicited testimony from Deputy White to try and establish that, at the time of the statement, the Defendant was not in custody for Miranda purposes. The Defendant also denies that Deputy White ever read him his Miranda rights. The Defendant was taken to a holding room in Chesterfield County Detention Center to wait for Investigator Daniel Scott.

At the motion hearing, Investigator Scott testified that, when he arrived at the detention center, he read the Defendant his Miranda rights, had him initial the Statement of Miranda Rights and sign the Waiver of Rights, and then proceeded to take the Defendant's statement in which he admitted that he "shot [the gun] in the ground" during the altercation with Ms. Oliver. The Defendant, on the other hand, testified that Investigator Scott immediately told him, without first reading the Defendant his Miranda rights, that the police knew the Defendant had a gun and shot the gun and unless he told the truth, he would not get a bond. According to the Defendant, at that point, threatened with no bond unless he told the truth, he admitted to shooting the gun during the altercation with his girlfriend. Further, the Defendant claims that it was not until after this admission that Investigator Scott placed a form in front of him to sign and write down what happened. This form turned out to be the Statement of Miranda Rights and Waiver of Rights form. The Defendant claims that the form was never explained to him, and he was never read the rights on the form. According to the Defendant, the lack of explanation of his Miranda rights was compounded by the fact that he had been drinking alcoholic beverages earlier in the evening, and therefore, he did not voluntarily and intelligently waive his Miranda rights.

3

**Discussion**

The Defendant contends that assuming the "emergency doctrine" purpose here was to clear the house for those in perceived danger, once that was accomplished, the police needed consent or a warrant to re-enter the house. In the instant matter, the Defendant argues that the police did not have consent to re-enter the house and seize the firearm, and therefore, the firearm must be suppressed. The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated . . ." U.S. Const. amend. IV. Thus, the Fourth Amendment prohibits unreasonable searches, and a search conducted without a warrant is per se unreasonable unless it falls within a valid exception to the warrant requirement. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219 (1973); *see United States v. Bush,* 404 F.3d 263, 275 (4th Cir. 2005). Valid consent is a well-recognized exception to the Fourth Amendment's prohibition against warrantless searches. *Illinois v. Rodriguez,* 497 U.S. 177, 181 (1990); *United States v. Neely,* 564 F.3d 346, 350 (4th Cir. 2009). The government bears the burden, by a preponderance of the evidence, that it obtained valid consent to search. *See United States v. Buckner,* 473 F.3d 551, 554 (4th Cir. 2007). In enforcing the Fourth Amendment's "guarantees of sanctity of the home and inviolability of the person," the exclusionary rule operates to require the suppression of evidence that is the fruit of unlawful police conduct. *Wong Sun v. United States*, 371 U.S. 471, 484 (1963).

While Deputy White testified that he obtained consent from Ms. Oliver to search the house prior to re-entering the house and seizing the firearm, there are too many inconsistencies between Deputy White's testimony and other evidence in the record. In addition to Ms. Oliver's testimony that she did not give Deputy White consent to search the house, Deputy White's own Incident Report from October 17, 2009, fails to state that he obtained consent prior to securing the firearm. Def.['s] Ex.1. The

Incident Report appears to suggest that Deputy White seized the firearm when he "cleared" the residence and before he even spoke with Ms. Oliver or re-entered the house. The Incident Report makes no mention of any consent, nor does it make any mention of a second re-entry into the residence, and the sequence of events testified to by Deputy White at the motion hearing held on September 12, 2011, appears contradicted by the Incident Report prepared the morning of the Defendant's arrest, which was October 17, 2009. Specifically, the Incident Report states, in pertinent part:

> On the above date and time we were dispatched to the listed location in reference to a domestic dispute and fight. Upon arrival at this location deputies cleared the home to find no one at this residence. Deputies did see a pistol listed above laying on the floor of the first room in which we entered. Deputy White then secured the firearm and the bullets which were found on the bed in the back bedroom. The uncle of the victim listed came to the residence to inform us that the victim was next door at his residence. Upon speaking with the victim she stated that her and the offender had gotten into an argument . . .

*Id.* The inconsistencies in the record and evidence presented support a finding, based on the totality of the circumstances, that the government has failed to meet its burden to show that it obtained valid consent to re-enter and search the house in which the firearm was seized, and the Defendant's Motion to Suppress is granted with respect to the firearm.

The Defendant has also moved to suppress his alleged admissions or statements to Deputy White that he discharged the firearm during the altercation with Ms. Oliver, as well as a second statement, his "Voluntary Statement" [Pl.['s] Ex.3] given to Investigator Scott at the detention center. A defendant must be advised of his Miranda rights prior to being interrogated while in custody. *Miranda v. Arizona,* 384 U.S. 436 (1966). In order for the waiver of rights protected by the Miranda warnings to be valid, it must (1) be voluntary rather than forced through intimidation, coercion, or deception, and (2) made with the awareness of the right being waived and the consequences of that

5

waiver. *United States v. Cristobal,* 293 F.3d 134, 139-40 (4th Cir. 2002). The government bears the burden of proof to show that the suspect understood the Miranda warnings and voluntarily and intelligently relinquished them. *Moran v. Burbine,* 475 U.S. 412, 421 (1986). Assuming that Miranda warnings have been properly given prior to any custodial interrogation, the question then becomes whether any statement made by the subject during the interrogation was voluntary within the meaning of the Due Process Clause. *United States v. Byers,* – F.3d –, 2011 WL 1718895, 15 (4th Cir. 2011). As the Fourth Circuit stated in *Byers,* "[i]n considering the voluntariness of a statement under the Due Process Clause, we must determine whether the confession was extracted by any sort of threats or violence, or obtained by any direct or implied promises, however slight, or by the exertion of any improper influence." *Id.* (citing *Hutto v. Ross,* 429 U.S. 28, 30 (1976)). However, "the mere existence of threats, violence, implied promises, improper influence, or other coercive police activity does not automatically render a confession involuntary. The proper inquiry is whether the defendant's will has been overborne or his capacity for self-determination critically impaired." *Id.* (citing *United States v. Braxton,* 112 F.3d 777, 780 (4th Cir. 1997)). In making this determination, courts must consider "the totality of the circumstances, including the characteristics of the defendant, the setting of the interview, and the details of the interrogation." *Id.*

Deputy White claims that the Defendant admitted to discharging the firearm prior to being detained and, therefore, the conversation was not a "custodial interrogation" subject to prior Miranda warnings. However, it is unclear from the record whether the Defendant, prior to being arrested and handcuffed, admitted to Deputy White that he discharged the firearm. According to the Defendant, the only words exchanged between the two took place while he was being handcuffed and consisted of Deputy White's stating that he had found a gun and some scales. The testimony of Jamie Pegues

6

supports the Defendant's claim that the Defendant did not have a conversation with Deputy White prior to being handcuffed. Moreover, it is disputed that Deputy White ever read the Defendant his Miranda rights. A review of Deputy White's Incident Report raises the additional question of whether the Defendant's alleged admission occurred over the phone or at the time of his arrest. Based on the totality of the circumstances and the inconsistencies between Deputy White's testimony and the other evidence in the record, the Court grants the Defendant's Motion to Suppress with respect to any alleged admission by the Defendant at the time of his arrest at his mother's house.

With respect to the Defendant's statement to Investigator Scott, his "Voluntary Statement," the Defendant alleges "Investigator Scott also violated the [D]efendant's due process rights under the Fifth Amendment to the Constitution of the United States by threatening the Defendant with detention without a bond and thereby eliciting an involuntary oral confession before placing the Miranda form in front of the Defendant so that the defendant could ostensibly waive those rights." Mot. to Suppress, p.4. At the motion hearing, Investigator Scott testified that when he arrived at the detention center, before he proceeded with any questioning, he gave the Defendant the Statement of Miranda Rights, read the rights verbatim, and the Defendant acknowledged that he understood each right by initialing by each one. He also testified that the Defendant did not appear to be under the influence of any drugs or alcohol and voluntarily waived his Miranda rights prior to giving his statement. The initialed Statement of Miranda Rights and signed Waiver of Rights was admitted without objection as Plaintiff's Exhibit #2. As to this issue, the Court finds Investigator Scott credible and questions the Defendant's credibility. For example, the Defendant has had significant experience with the criminal justice system and has been arrested more than ten times, but claims that only on one occasion has he ever been read his Miranda rights. Based on the totality of the circumstances, the Court finds that the Defendant's

waiver of his Miranda rights was valid, as it was voluntary and made with the awareness of the rights being waived and the corresponding consequences.

With respect to the voluntariness of the Defendant's statement to Investigator Scott, the Court finds that the Defendant was not under the influence of any drugs or alcohol, nor was he subject to any form of duress, coercion, or improper influence. The Court does not find credible the Defendant's allegation that Investigator Scott threatened him with detention without bond if he refused to confess. Finally, the totality of the circumstances, including the characteristics of the Defendant, the setting of the interview, and the details of the interrogation demonstrate that the Defendant's statement was voluntary. At the time of the interview, the Defendant was a 35 year old who, given his criminal history, had significant experience with the criminal justice system. His interview took place on a bench outside of the holding cells at the detention center, and the interview was conducted less than two hours after his arrest and only after he had been read his Miranda rights and provided with a written version of the same. It appears that less than 25 minutes elapsed between the Defendant's signing of the Waiver of Rights and the completion of his written statement. Based on the totality of the circumstances, the Court finds that the Defendant's will was not "overborne," nor was "his capacity for self-determination critically impaired." Rather, all of these factors support the Court's conclusion that the Defendant's "Voluntary Statement," in which he admitted to discharging the firearm, was given freely and voluntarily after a valid waiver of his Miranda rights. Thus, the Defendant's Motion to Suppress is denied with respect to his "Voluntary Statement" given to Investigator Scott.

## Conclusion

Based on the foregoing, the Defendant's Motion to Suppress [Docket #41] is **GRANTED in part, DENIED in part**. Specifically, the motion is granted with respect to the seized firearm and the

alleged admission to Deputy White by the Defendant at the time of his arrest at his mother's house; the motion is denied with respect to his "Voluntary Statement" given to Investigator Scott.

**IT IS SO ORDERED.**

                                                    s/R. Bryan Harwell
                                                   R. Bryan Harwell
                                                   United States District Judge

September 13, 2011
Florence, South Carolina